# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL AUTOMOBILE DEALERS ASSOCIATION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Civil Action No. 11-1711 (ESH)** |
| FEDERAL TRADE COMMISSION, | ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

The National Automobile Dealers Association ("NADA") challenges the Federal Trade Commission's ("FTC" or "Agency") interpretation of the meaning of "uses a consumer report" in the amended Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(h).  As set forth in a preamble to amended regulations related to "risk-based pricing" of consumer credit, the FTC contends that an automobile dealer that does not obtain a consumer report nonetheless "uses" it when the dealer executes a credit contract based upon a third-party financing source's use of the consumer report.  NADA contends that this interpretation violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*., claiming that it is (1) ultra vires and (2) arbitrary, capricious, or otherwise not in accordance with law.  Before the Court are the FTC's motion to dismiss and NADA's motion for summary judgment.  For the reasons explained herein, the FTC's motion will be granted and NADA's motion will be denied.[1]

---

[1] The memoranda in support of these motions will be referenced as follows: Plaintiff's Motion for Summary Judgment ("Pl.'s Mot. for Summ. J."); Defendant's Opposition to Pl.'s Mot. for Summ. J. ("Def.'s Opp'n"); Plaintiff's Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply"); Defendant's Motion to Dismiss ("Def.'s Mot. to Dismiss"); Plaintiff's Opposition to

## BACKGROUND

### I.    LEGAL FRAMEWORK

In 2003, Congress enacted the Fair and Accurate Credit Transactions Act of 2003

("FACT Act" or "Act"), Pub. L. No. 108-159, 117 Stat. 1952, to "prevent identity theft, improve

resolution of consumer disputes, improve the accuracy  of consumer records, [and] make

improvements in the use of, and consumer access to, credit information."  *Id*.  The FACT Act

amended the FCRA by adding, among other things, a provision that governs the "[d]uties of

users in certain [consumer] credit transactions." 15 U.S.C. § 1681m(h).  That provision addresses

a practice known as "risk-based pricing" and provides statutory protections for consumers who,

based on information contained in their "consumer report[s],"[2] are offered credit at "materially

less favorable [terms] than the most favorable terms available to a substantial proportion of

consumers."  *Id*. § 1681m(h)(1).[3]  In such circumstances, prospective buyers are entitled to

receive a "risk-based pricing notice" ("RBPN") alerting them to the potential existence of

negative information in their credit reports so that they can check their credit histories and

correct any inaccuracies.  *Id*. at 41,603.  Specifically, the creditor must explain that information

Def.'s Mot. to Dismiss ("Pl.'s Opp'n"); Defendant's Reply in Support of Mot. to Dismiss
("Def.'s Reply").  The joint Local Rule 7(n) Appendix will be referenced as "App."

[2] A "consumer report" is "the communication of any information by a consumer reporting
agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character,
general reputation, personal characteristics, or mode of living which is used or expected to be
used or collected in whole or in part for the purpose of serving as a factor in establishing the
consumer's eligibility for [credit, insurance, employment, or other authorized purposes]."
15 U.S.C. § 1681a(d)(1). "Consumer report" and "credit report" are used interchangeably in this
Memorandum Opinion.

[3] "Risk-based pricing" refers to the practice of setting or adjusting the terms of credit offered to a
consumer to reflect the risk of nonpayment by that consumer.  "Creditors that engage in risk-
based pricing generally offer more favorable terms to consumers with good credit histories and
less favorable terms to consumers with poor credit histories."  *Fair Credit Reporting Risk-Based
Pricing Regulations, Final Rules*, 76 Fed. Reg. 41,602, 41,603 (July 15, 2011).

in the credit report was a factor in setting the unfavorable interest rate, how the consumer can obtain his or her credit history report, and how to correct false or incomplete data.  Prior to the 2003 amendment, consumers were not entitled to receive such notice upon receiving *less favorable* credit terms; they only received notice for more drastic "adverse actions," such as denial of a loan.  These RBPNs must be provided to consumers by "any person" who "*uses* a consumer report in connection with an application for, or a grant, extension, or other provision of, credit."  15 U.S.C. § 1681m(h)(1) (emphasis added).

The Act also required the FTC to prescribe regulations to carry out the new risk-based pricing law, including set the "form, content, time, and manner of delivery of any notice under this subsection," establish exceptions to the notice requirement, and "clarify the meaning of terms used in this subsection."  15 U.S.C. § 1681m(h)(6).[4]  Accordingly, on May 19, 2008, the FTC initiated notice-and-comment rulemaking proceedings by publishing a notice of proposed rulemaking and soliciting comments from interested parties.  *Fair Credit Reporting Risk-Based Pricing Regulations; Proposed Rule*, 73 Fed. Reg. 28966 (May 19, 2008).

NADA and two other associations in the automobile dealer industry submitted letters in which they argued that automobile dealers should be exempt from providing an RBPN when they engage in "three-party" financing transactions; that is, when the dealer agrees to extend financing to a consumer and then immediately assigns the loan to a third party, such as a bank or finance company.  (App. at 64-82 (public comment letters dated August 2008).)  In these circumstances, NADA explained, it is the third-party financing company, and not the dealer, that does the risk-based pricing, for it is the financing company that evaluates the consumer's credit

---

[4] The Act required the FTC to issue regulations jointly with the Board of Governors of the Federal Reserve System.  The regulations were promulgated by both agencies but, because the FTC's interpretation is the subject of the instant suit, this Memorandum Opinion will focus only on the FTC's role.

and proposes a wholesale interest rate (the "buy" rate) at which it will underwrite the auto loan. (*Id*. at 63.)  The dealer relies on the "buy" rate to offer the consumer an auto loan at a higher retail interest rate than is available to car buyers with better credit histories.  (*Id*.)  Therefore, NADA argued, the obligation to provide the RBPN should fall on the financing sources that set the risk-based price and not on the auto dealers.  (*Id*. at 66.)

On January 15, 2010, the FTC adopted the Fair Credit Reporting Risk-Based Pricing Regulations.  75 Fed. Reg. at 2724-84.  In the final regulations, it addressed—and rejected— NADA's argument, concluding that an initial creditor,[5] such as an auto dealer, must provide the RBPN within the context of three-party transactions.  *Id*. at 2730, 2759, 2775-76; *see* 16 C.F.R. § 640.6(b); 12 C.F.R. § 222.75(b).  Specifically, the Agency took the position that auto dealers that are original creditors are considered to "use" the credit reports to determine which third-party financing source to approach for financing, even if they do not set the risk-based price, and therefore fall within the purview of § 1681m(h).  75 Fed. Reg. at 2730.

On January 5, 2011, a few days after these rules took effect, NADA sought formal guidance from the FTC on whether this requirement applied to auto dealers that are initial creditors in three-party transactions and do not obtain a copy of the credit report ("Non-Consumer Report Dealers"), but instead, they leave it to the financing sources to obtain one. (*See* App. at 167-73 (Jan 5, 2011 letter from NADA to the FTC).)  In this circumstance, the financing source usually obtains the consumer report, but the auto dealer does not and therefore, NADA argues, the dealer cannot be said to "use" the credit report.  (*Id*.)

---

[5] "Initial creditor" or "original creditor" are used interchangeably and they refer to the entity with whom the consumer signs the contract.  75 Fed. Reg. at 2730.  This means that if, in the three-party transaction, the consumer enters into a contract directly with the financing source, the financing source must provide the RBPN.  *Id*.

In March 2011, the FTC initiated a new rulemaking proceeding to amend the risk-based

pricing regulations pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection

Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010). *Fair Credit Reporting*

*Risk-Based Pricing Regulations, Notice of Proposed Rulemaking*, 76 Fed Reg. 13902 (Mar. 15,

2011).[6]  At the FTC's suggestion, NADA submitted its January 5, 2011 inquiry as a comment in

this recently-initiated rulemaking proceeding.  (App. at 173-74; *see also id*. at 167-72.)[7]

On July 15, 2011, the FTC promulgated amendments to the Fair Credit Risk-Based

Pricing Regulations.  The amendments, codified at 16 C.F.R. Part 640, "require disclosure of

credit scores and information relating to credit scores in [RBPNs] if a credit score of the

consumer is used in setting the material terms of credit."  76 Fed. Reg. at 41,602.

In the preamble to the amended rule, the FTC published a section entitled

"Supplementary Information" which included responses to various submissions received during

the notice-and-comment period.  *See* 76 Fed. Reg. at 41,602-26.  In this section, the FTC set

forth its Interpretation of the scope of the word "uses" as employed in § 1681m(h) of the

amended FCRA ("Interpretation").  76 Fed. Reg. 41,606-07 & nn. 5-9.  The FTC rejected

NADA's suggested interpretation and construed § 1681m(h) to apply to an automobile dealer

that uses consumer reports to offer materially less favorable credit terms to car buyers—even

when the dealer "does not directly obtain the consumer report[s] and/or credit score[s] from a

---

[6] The Dodd-Frank Act, signed into law on July 21, 2010, amended the FCRA's risk-based
pricing protections.  In particular, section 1100F of the Dodd-Frank Act strengthened consumers'
rights by requiring that RBPNs include a consumer's credit score if that credit score was used in
making the credit decision.

[7] In informal conversations, FTC staff attorneys had taken the position that auto dealers in this
category "used" the consumer reports, even if they did not physically obtain them, and therefore
the auto dealers were required to provide RBPNs to consumers.  (*Id*. at 168.)

consumer reporting agency," but instead it takes an action based on the decision of a third-party

financing source that relies upon the consumer report.  76 Fed. Reg. at 41,606.

It is this interpretation that plaintiff challenges here.  Specifically, NADA asserts that the

Interpretation of § 1681m(h) violates the APA.[8]   In Count I, it claims that the FTC's

interpretation exceeds the FTC's statutory authority in violation of 5 U.S.C. § 706(2)(C).

(Compl.  ¶¶ 36-42.)  In Count II, it claims that the FTC's interpretation should be set aside under

5 U.S.C. § 706(2)(A) as arbitrary, capricious, or otherwise not in accordance with law.  (Compl.

¶¶ 43-54.)

## ANALYSIS

## I.     LEGAL STANDARD

Although motions to dismiss and for summary judgment are normally judged under

different legal standards, the inquiry in this case is the same.  *See Marshall Cnty. Health Care*

*Auth. v. Shalala*, 988 F.2d 1221, 1222-23 (D.C. Cir. 1993) ("The district court may, however,

examine matters of public record in ruling on a Rule 12(b)(6) motion, and when a district court is

reviewing agency action—sitting as an appellate tribunal—the legal questions raised by a

12(b)(6) motion and a motion for summary judgment are  the same.")  However, since it is "the

---

[8] At the same time, NADA filed a petition for review in the Court of Appeals.  *See Nat'l Auto.
Dealers Ass'n v. FTC,* No. 11-1313 (D.C. Cir. Sept. 9, 2011).  When the FTC moved to dismiss
for lack of appellate jurisdiction, NADA did not dispute the FTC's argument, but explained that
it filed the petition as "'a protective measure' to ensure compliance with the relevant
jurisdictional deadlines" in the event that either court found that its challenge was subject to
direct appellate review.  *Nat''l Auto. Dealers Ass'n v. FTC*, , 270 (D.C. Cir. 2012) (quoting Pet'r
Resp. to Resp't Mot. to Dismiss at 2-3).  Agreeing with the FTC that "a challenge to such an
interpretation must begin in the district court, [the Court of Appeals] dismiss[ed] [NADA's]
petition for lack of jurisdiction."  *Id*. at 269.

better practice," *id.* at 1226 n.5, the Court will convert defendant's motion to dismiss into a motion for summary judgment.

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In a case involving review of a final agency action under the APA however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. *See Nat'l Wilderness Inst. v. U.S. Army Corps of Eng'rs*, No. 01-0273, 2005 U.S. Dist. LEXIS 5159, 2005 WL 691775 at *7 (D.D.C. Mar. 23, 2005); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record."). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), *aff'd*, 348 F.3d 1060 (D.C. Cir. 2003).

## II.    *ULTRA VIRES* CHALLENGE

To assess NADA's first claim—that the Interpretation exceeds the FTC's statutory authority—the Court must begin "with the first step of the two-part framework announced in *Chevron* . . . and ask whether Congress has 'directly addressed the precise question at issue.'" *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (quoting *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984)). "Under *Chevron* Step One, the court examines the statute de novo," by applying "the traditional tools of statutory construction." *Eagle Broad. Group, Ltd. v. FCC*, 563 F.3d 543, 550, 552 (D.C. Cir.

2009) (citing *Chevron*, 467 U.S. at 842-43).  "If this 'search for the plain meaning of the statute . . . yields a clear result, then Congress has expressed its intention as to the question,'" and the court need not proceed further because "'deference is not appropriate.'" *Eagle Broad.*, 563 F.3d at 552 (quoting *Bell Atlantic Tel. Cos. v. FCC*, 131 F.3d 1044, 1047  (D.C. Cir. 1997)).  However, if "Congress has not directly addressed the precise question at issue," and the agency has acted pursuant to an express or implied delegation of authority, the court must proceed to the second step of *Chevron*.  *Chevron*, 467 U.S. at 843.  At that stage, "the agency's statutory interpretation is entitled to deference, as long as it is reasonable."  *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 842-43).[9]

### A.    *Chevron* Step One

Although NADA and the FTC contend that the statute is unambiguous, and thus the inquiry should end at Step One, they disagree about the meaning of the term "uses."  (Pl.'s Opp'n at 7; Def.'s Mot. to Dismiss at 13, 22.)  Therefore, Court's first task is to determine whether the statute is ambiguous by "consider[ing] the provisions at issue in context, using traditional tools of statutory construction and legislative history."  *Wells Fargo Bank, N.A. v. FDIC*, 310 F.3d 202, 206 (D.C. Cir. 2002).

The statute requires that

> any person [who] *uses* a consumer report in connection with an
> application for, or a grant, extension, or other provision of credit
> on material terms that are materially less favorable than the most
> favorable terms available to a substantial proportion of consumers
> from or through that person, based in whole or in part on a
> consumer report, the person shall provide . . . notice to the

---

[9] As discussed in Section II(B), *infra*, the parties dispute whether, at Step Two, the Agency's interpretation warrants deference, and, if so, whether it should be under *Chevron* or *Mead*.  (*See* Pl.'s Opp'n at 5, 20-25.)

> consumer in the form and manner required by regulations
> prescribed in accordance with this subsection.

15 U.S.C. § 1681m(h)(1) (emphasis added).

"Uses" is not defined in the statute.  The parties debate whether the term refers narrowly to direct use by those who obtain a physical copy of the report or whether it encompasses indirect or attenuated reliance upon the consumer report (*i.e.*, based on use by third-party financing sources upon which the auto dealers depend).[10]  Plaintiff contends that, by employing the term "use," the statute covers only auto dealers that physically "obtain, receive, or review a consumer report" and rely on the information contained within it to decide material terms of the consumer contracts.  (Pl.'s Mot. for Summ. J. at 1, 12)  Defendant, by contrast, urges a broader definition, arguing that the provision applies to both auto dealers that obtain the physical report to use directly, as well as to Non-Consumer Report Dealers.  (Def.'s Mot. to Dismiss  at 8.)

The term "use" is arguably susceptible to either definition.  The inquiry, of course, "'begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'"  *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar*

---

[10] Plaintiff vigorously disputes the notion that auto dealers even indirectly use consumer reports because they do not "obtain, receive, or review the consumer report[s]" and may never see a summary of the data contained in such reports.  (Pl.'s Reply at 2.)  However, its attempt to distance auto dealers' actions from those of the financing sources that possess the report (Pl.'s Opp'n at 11-12) are unavailing.  NADA concedes that Non-Consumer Report Dealers accept consumers' credit applications and send them to third-party financing sources and are subsequently advised by the financing source whether and on what terms it will purchase the credit contract.  (Pl.'s Mot. for Summ. J. at 1 (explaining that the dealer initiates the request that prompts the financing source to obtain credit reports).)  Then, "[b]ased on the finance source's agreement to purchase the credit contracts, [which is usually based on its review of the credit report,] . . . the dealer enters into a credit contract with the consumer. . . ."  (*Id.* at 4; *see also id.* at 1; App. at 168 (NADA's Jan. 5, 2011 letter to the FTC).)  Therefore, the Court finds it reasonable to view a dealers' use as indirect or attenuated, but notes that this conclusion does not does not resolve the instant challenge.

*Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). Thus, "[t]he word 'use' in the statute must be given its 'ordinary or natural' meaning, a meaning variously defined as 'to convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" *Bailey v. United States*, 516 U.S. 137, 145 (1995) (quoting *Smith v. United States*, 508 U.S. 223, 228-29 (1993) (internal quotation marks omitted)); *Oxford Dictionaries Pro* (2012) (defining "use" as "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employ"). Considering this term within a different statute, the Supreme Court concluded that "[t]hese various definitions of 'use' imply action and implementation." *Bailey*, 516 U.S. at 145; *see also Smith*, 508 U.S. at 228 ("[O]ver 100 years ago we gave the word 'use' the same gloss, indicating that it means 'to employ' or 'to derive service from.'") (citation and some internal quotation marks omitted). But these definitions do not provide any guidance as to the degree of directness necessary to "employ," "avail oneself of," or "derive service from."

However, "[l]anguage, of course, cannot be interpreted apart from context," *Smith*, 508 U.S. at 229, and both parties posit that the statutory context resolves any possible ambiguity. (Def.'s Mot. to Dismiss at 17; Pl.'s Opp'n at 9; Pl.'s Reply at 3-4); *see also Smith*, 508 U.S. at 229 ("The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it.") The FTC argues that the statute's use of the terms "obtain," "procure," and "furnish" in other sections (*e.g.*, 15 U.S.C. §§ 1681a, 1681b, 1681e, 1681g,) demonstrates that, when Congress meant to refer to physical possession of the consumer report, it did so in more precise terms. (Def.'s Mot. to Dismiss at 16-19; 76 Fed. Reg. at 41,607 n.8.) Therefore, it reasons, the fact that Congress chose the term "use" in §1681m(h) shows that it intended to signify broader coverage. NADA counters that, as a practical matter, "use" is necessarily narrower, and it refers exclusively to those who actually

obtain the credit report because only they would have the data (*e.g.*, the credit score and the identity of the credit reporting agency) that must be included in the RBPN.  (Pl.'s Mot. for Summ. J. at 14.)  Both parties rely on § 1681m(e)(4), which defines a creditor as one who "obtains or uses consumer reports, directly or indirectly, in connection with a credit transaction." The FTC contends that the inclusion of both "obtain" and "uses" shows that "use" must refer to more than mere physical possession.   (Def.'s Mot. to Dismiss at 18.)  NADA, for its part, focuses on the clause "directly or indirectly," arguing that, if Congress had meant for § 1681m(h)'s "use" to include indirect use, it would have said so.  (Pl.'s Mot. for Summ. J. at 17; Pl.'s Opp'n at 9.)

However, NADA does not explain why, if Congress meant to limit the reach of § 1681m(h) to only those who physically obtain a consumer report or the information therein, it did not again employ a more specific term like "obtain" or "procure," and further, it simply ignores the fact that, when drafting § 1681m(h), Congress chose the broadest of the terms found in the statute.  Nor can NADA explain why both terms—"uses" and "obtains"— appear together in § 1681m(e)(4) if, as it suggests, "use" should mean the same as "obtains" in §1681m(h).[11]  For these reasons, there are serious deficiencies in plaintiff's "plain meaning" argument.  *See Bailey*, 516 U.S. at 146 ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning").

On the other hand, the FTC has not shown how the statute contemplates that an auto dealer that does not have the basic information contained in a consumer report (which is

---

[11] According to NADA, it does not argue that "use" must mean "obtain," but rather that "use" also refers to those who receive or review the report (or a summary of its information).  (*See* Pl.'s Reply at 2).  However, this distinction is irrelevant since receiving or reviewing the report also means obtaining it or the information therein.

necessary to issue an RBPN), could provide one to a consumer.[12]  Although this does not necessarily render the Interpretation erroneous, *see Union Bank v. Wolas*, 502 U.S. 151, 158 (1991) (explaining that "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning"), neither does it dispel the ambiguity that NADA has identified.

Finally, the parties contend that the legislative history confirms their reading of the statute.  (Def.'s Mot. to Dismiss at 19-22; Pl.'s Mot for Summ. J. at 16-19.)   However, there is no indication that Congress even considered the question.  Instead, the snippets of legislative history that both have offered are, at best, evidence of the congressional purpose.  None of these, however, provide clarity as to the meaning of "uses."  *See Vencor, Inc. v. Physicians Mut. Ins. Co*., 211 F.3d 1323, 1325-26 (D.C. Cir. 2000) (explaining that appeal to the "'broad purposes' of legislation" may "ignore[] the complexity of the problems Congress is called upon to address and the dynamics of legislative action") (quoting *Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp*., 474 U.S. 361, 373-74 (1986)).

Nor do NADA's citations to other cases involving §1681m(h) clarify the meaning of "uses."  (*See* Pl.'s Opp'n at 12-14.)   Although plaintiff relies heavily on *Castro v. Union Nissan, Inc*., No. 01 C 4996, 2002 U.S. Dist. LEXIS 12917 (N.D. Ill. July 3, 2002), that case is simply too dissimilar to be instructive.  In *Castro*, the plaintiff had filed suit against Union Nissan for unauthorized pulls of its credit report by third-party financing sources.  *Id*. at ** 2-4.  That case dealt with a different subsection of the statute (§ 1681b(f)), and the plaintiff made no argument that Union Nissan was in fact a "user" of its credit report.  *Id.* at *9.  Most importantly, there was

---

[12] Defending the reasonableness of the Interpretation, the FTC explains how Non-Consumer Report Dealers that never obtain a physical copy of the consumer report could nonetheless provide an RBPN to a consumer.  (*See infra* n. 17.)  However, the agency's resolution of the matter cannot inform the Court's analysis under the first step of *Chevron*.

no allegation that Union Nissan took any action based on decisions by the financing sources that had pulled the report without authorization.  *Id.*  The other cases cited by NADA are even less relevant.  *See Gonzalez-Bencon v. Doral Bank*, 759 F. Supp. 2d 229, 237 (D.P.R. 2011) (finding that § 1681m was inapplicable in a suit against a bank that furnished allegedly incorrect information to the consumer reporting agency); *Mick v. Level Propane Gases, Inc*., 183 F. Supp. 2d 1014, 1020 (S.D. Ohio 2000) (uncontested that defendant was a "user" of consumer reports); *Morrissey v. TRW Credit Data*, 434 F. Supp. 1107, 1108 (E.D.N.Y. 1977) (company found to have "used" report actually obtained it).

Ultimately, each party has shown that the statute is capable of supporting its interpretation, but neither has shown that the statutory text is unambiguous.  *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 71-72 (D.D.C. 2006) (finding ambiguity when "[t]he statute simply does not lend itself clearly to either approach urged by the parties here, and the text and reasonable inferences from it [do not] give a clear answer against either party") (internal quotation  marks omitted), *aff'd* 226 Fed. Appx. 4, 5 (D.C. Cir. 2007) (internal quotation marks omitted); *see also PDK Labs. Inc. v. U.S. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("That a statute is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction . . . .").  Thus, the Court cannot find "that the statute is unambiguous with respect to 'the precise question at issue,'" *Wells Fargo Bank, N.A.*, 310 F.3d at 206 (quoting *Chevron*, 467 U.S. at 842), and will proceed to *Chevron*'s second step.

### B.    *Chevron* Step Two

At Step Two, the sole question is whether the Interpretation is "a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  However, before reaching this issue, two threshold arguments must be addressed.  First, plaintiff argues that no deference is due because the FTC has not been delegated authority to regulate Non-Consumer Report Dealers.  (Pl.'s Mot. for

Summ. J. at 22-24.)  Alternatively, it argues, even if some level of deference were due, *Chevron* deference is not warranted here because the Interpretation was not the product of notice-and-comment rulemaking.  (*See id*. at 19-20.)

### 1. Delegated Authority

"[D]eference to an agency's interpretation of a statute is due only when the agency acts pursuant to delegated authority. . . . Absent such authority, [a court] need not decide whether the regulations are otherwise reasonable" because "[a]n agency may not promulgate even reasonable regulations that claim a force of law without delegated authority from Congress."  *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) (internal quotation marks and citations omitted); *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005) ("The deference mandated in *Chevron* 'comes into play, of course, only as a consequence of statutory ambiguity, and then *only* if the reviewing court finds an implicit delegation of authority to the agency.'") (quoting *Sea-Land Serv., Inc. v. Dep't of Transp*., 137 F.3d 640, 645 (D.C. Cir. 1998)).

It is undisputed that the FTC has been delegated authority to "prescribe rules" setting forth the content and timing of RBPNs and exceptions to the notice requirement and "clarify[ing] the meaning of the terms used in [§ 1681m(h)]," 15 U.S.C. § 1681m(h)(6).  (Pl.'s Mot. for Summ. J. at 5; Def.'s Mot. to Dismiss at 6.)  Thus, plaintiff's argument—which is really just another version of its statutory challenge— is that defendant lacks the authority to "expand the coverage of [the statute]" by "redefin[ing] the word 'use.'"  (Pl.'s Mot. for Summ. J. at 23.) However, given the explicit delegation of authority in § 1681m(h)(6), it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law" with respect to gaps or ambiguities in § 1681m(h).  *United States v. Mead Corp*., 553 U.S. 218, 229 (2001).

### 2. Lack of Notice-and-Comment Rulemaking.

Even when an agency has been delegated authority to act, "no *Chevron* deference is due unless the agency's action has the 'force of law.'" *Motion Picture Ass'n of Am.*, 309 F.3d at 801 (quoting *Mead Corp.*, 553 U.S. at 227). Since the Interpretation was published in the preamble to the 2011 regulations and was not subject to notice-and-comment rulemaking proceedings, NADA argues that the Agency cannot claim *Chevron* deference. (Pl.'s Mot. for Summ. J. at 22-24.)

The FTC's first argument, that it deserves *Chevron* deference because NADA is actually challenging the 2010 regulations (Def.'s Opp'n at 23),[13] is unsupported by the record, which makes clear that the Interpretation arose in the preamble to the Dodd-Frank Act regulations. *See Nat'l Automobile Dealers Ass'n*, 670 F.3d at 269 ("The Commission announced this interpretation in a Federal Register notice accompanying its promulgation of an amended rule regulating 'risk-based pricing' of consumer credit."). In the 2010 rulemaking, the FTC determined that auto dealers that were the initial creditors had to provide an RBPN even in the context of a three-party transaction where the financing source, and not the dealer, did the risk-based pricing. But, despite extensively detailing the obligations of original creditors in numerous situations, neither the 2010 regulations nor the 2010 preamble provides any indication as to how to handle the situation where an original creditor auto dealer never physically obtains the consumer report. *See* 75 Fed. Reg. at 2724-84. Moreover, in the 2010 regulations, the FTC's conclusion that auto dealers "used" the consumer report was based on the assumption that the auto dealer obtained the consumer report and used the information therein to determine which

---

[13] In the Court of Appeals case related to the instant suit, the FTC appeared to acknowledge that the Interpretation arose in the preamble to the 2011 regulations. *See* Mot. of Resp. FTC to Dismiss for Lack of Jurisdiction, at 5, *Nat'l Automobile Dealers Ass'n v. FTC*, No. 11-1313 (D.C. Cir. Oct. 26, 2011) ("The specific interpretation . . . consists of three paragraphs in the 'Supplemental Information' . . . accompanying the July 15, 2011 Federal Register publication of amended rule.").

financing source was "likely to purchase the retail installment sale contract."   *Id.* at 2730.  Thus, the Interpretation, as published in 2011, is based on a consistent, but nonetheless different logic. Therefore, if the FTC's interpretation is entitled to *Chevron* deference, it must derive from the interpretation published in the preamble to the 2011 regulations.

However, notwithstanding the absence of notice-and-comment rulemaking, the interpretation is entitled to *Chevron* deference under *Barnhart v. Walton*.  535 U.S. 212 (2002). In *Barnhart*, the Supreme Court explained that less formal interpretations may still warrant *Chevron* deference if "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue."  *Id*. at 222; *see also Mead Corp*., 533 U.S. at 230-31 ("The want of [notice and comment] does not decide the case.").

Indeed, the Court of Appeals has granted *Chevron* deference in analogous situations. *See, e.g*., *Menkes v. U.S. Dep't of Homeland Sec*., 637 F.3d 319, 331 (D.C. Cir. 2011) (affording *Chevron* deference to Coast Guard decision in adjudicatory proceeding because it was "bound up with the administration of the . . . scheme of regulating"); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (according *Chevron* deference to FDA letter due to "complexity of the statutory regime under which the FDA operates, the FDA's expertise[, and] the careful craft of the scheme it devised to reconcile the various statutory provisions"). Similarly here, the FTC has been specifically charged with clarifying the terms of and establishing the procedure for a complex system to enable consumers to correct their credit reports and to prevent identity theft.  Though § 1681m addresses only one part of the system, the

way that the provision is implemented affects other aspects of the statutory scheme.  Finally, the

Interpretation was published in the Federal Register, a factor which "is not in itself sufficient to

constitute an agency's intent that its pronouncement have the force of law," but "where, as here,

that publication reflects a deliberating agency's self-binding choice, as well as a declaration of

policy, . . . [it] is further evidence of a *Chevron*-worthy interpretation."  *Citizens Exposing Truth

About Casinos v. Kempthorne*, 492 F.3d 460, 467 (D.C. Cir. 2007) (internal citation omitted).

For these reasons, in addition to the Agency's thorough consideration of the matter, the Court

concludes that the agency's 2011 interpretation has the force of law, and on this basis, it will

proceed to *Chevron*'s second step.

### 3.      Reasonableness of Interpretation

At *Chevron*'s Step Two, the question for the court is "whether the agency's position rests

on a 'permissible construction of the statute.'"  *Mylan Labs., Inc*., 389 F.3d at 1280 (quoting

*Chevron*, 467 U.S. at 842-43).  "If Congress has explicitly left a gap for the agency to fill, there

is an express delegation of authority to the agency to elucidate a specific provision of the statute

by regulation" and "[s]uch legislative regulations are given controlling weight unless they are

arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 843-44.  Under

this deferential standard, "a court may not substitute its own construction of a statutory provision

for a reasonable interpretation made by the administrator of an agency."  *Id.* at 844.  Rather,

courts must uphold an agency's interpretation if it is "reasonable and consistent" with the

statutory purpose and legislative history.  *GTE Serv. Corp. v. FCC*, 205 F.3d 416, 421 (D.C. Cir.

2000).  However, "a court will not uphold an interpretation 'that diverges from any realistic

meaning of the statute.'"  *Id.* at 421 (quoting *Massachusetts v. Dep't of Transp*., 93 F.3d 890,

893 (D.C. Cir. 1996)).

Here, it is clear that the FTC's interpretation warrants deference.  First, as shown in Section II(A), *supra*, the agency's interpretation of § 1681m(h) is consistent with the language of the statute.

Second, the agency reasonably interpreted "use" to promote the FCRA's goal of providing consumers with accurate information about their credit reports.  (Def.'s Mot. to Dismiss at 22-24.)  The Interpretation is consistent with the FTC's regulatory regime, including the requirement that auto dealers that are initial creditors in three-party transactions provide the RBPN.  75 Fed. Reg. at 2730 (reasoning that "[t]he material terms of the sales contract—specifically the annual percentage rate of the automobile loan—are based, in part, on the 'buy' rate offered or expected to be offered by the third-party financing source. . . . Thus, automobile dealers that are original creditors in a three-party financing transaction must provide [RBPNs] to consumers").  In its 2010 determination, the FTC sought to ensure that "the consumer receive[d] the notice before entering the transaction and that the notice c[ame] from one source."  (Def.'s Mot. to Dismiss at 8.)  In 2011, when NADA asked whether Non-Consumer Report Dealers were subject to this requirement, the agency applied "a causal, transaction-based analysis" to the term 'use,'" and reasoned that the dealer was nonetheless required to provide the RBPN because it was the dealer that "initiated the request that caused the financing source to obtain the consumer report and used the resulting information from the financing source to set the rate offered to consumers."  76 Fed. Reg. at 41,606-07 (explaining that "[t]he original creditor incorporate[s] the wholesale buy rate in the rate offered to the consumer, establishing a causal connection between the consumer report and the ultimate rate offered to the consumer").[14]  Thus, the

---

[14] Contrary to NADA's assertion (Pl.'s Opp'n at 24), the absence of precedent for the FTC's "causal, transaction-based approach" does not render it a departure from any preexisting approach since the statute is new and its implementing regulations are new.  In addition, the

Interpretation retains the obligations of auto dealers that are initial creditors in three-party transactions and furthers the Act's broader goal of increasing consumers' access to accurate information about their credit reports.

Even if compliance with the Interpretation could create "awkward and burdensome" situations, as plaintiff suggests (Pl.'s Mot. for Summ. J. at 20), that does not render it unreasonable.  *See Apotex Inc.*, 414 F. Supp. 2d at 72 (explaining that, even if the agency's approach is imperfect in practice, "that would not provide a sufficient basis to render the [agency's] approach impermissible under *Chevron* step two").  On the contrary, a third reason that the Interpretation is reasonable is that it avoids the difficulties that flow from NADA's approach.  As defendant points out, NADA's interpretation could result in the confusing situation where consumers receive multiple notices or no notice at all, *see* 76 Fed. Reg. at 41,607 n. 9,[15] which would clearly contravene the statute.[16]  Construing "use" as NADA suggests could also seriously undermine the application of other provisions in the FCRA that relate to "use" of consumer reports.   (Def.'s Mot. to Dismiss at 8 (citing 15 U.S.C. §§ 1681a(d), 1681b(a)(3),

_____

Interpretation is consistent with the longer-standing requirement that auto dealers provide the RBPN even if they are engaged in three-party transactions in which the financing source (and not the dealer) actually sets the materially adverse price terms.  *See* 75 Fed. Reg. at 2730.

[15] The FTC explained that NADA's proposal would lead to situations in which consumers do not receive an RBPN at all, in contravention of the statute.  76 Fed. Reg. at 41,607 n.9. (Def.'s Opp'n at 1-2, 10.)  To remedy this, NADA proposes requiring finance sources to provide RBPNs to consumers.  (Pl.'s Opp'n at 14-15 & n.8.)  Among the problems with this "fix," however, is the fact that it could create the confusing situation in which a consumer receives multiple reports (for example when the dealer and the financing source both obtain consumer reports or when the dealers corresponds with multiple financial sources).  76 Fed. Reg. at 41,607 n.9.

[16] NADA's argument that the Interpretation would require the Non-Consumer Report Dealer to provide an RBPN where no consumer report had been used by *either* the dealer or the financing source (Pl.'s Mot. for Summ. J. at 22; Pl.'s Opp'n at 25) is inconsistent with the statutory text.  If neither party "uses" the consumer report in any fashion, the duty to provide an RBPN would not be triggered.  (Def.'s Reply at 2 n.1.)

1681m(a), 1681m(g)).)  In addition, NADA's interpretation could provide an undesirable incentive for original creditors—even in other industries—to arrange financing through third parties in order to avoid their obligation to provide an RBPN.  (Def.'s Mot. to Dismiss at 21 (explaining that this is a concern since § 1681m(h) is not limited to auto dealers).)  In short, the practical effects of NADA's interpretation could greatly undermine the Act's goal of providing information about credit reports to consumers.  Therefore, it is reasonable and desirable for the FTC to avoid those consequences.[17]  *See Menkes*, 637 F.3d at 331 ("[T]he potential ramifications of the agency's decision confirm that these are precisely the sort of complex, interstitial questions that [it] deserves deference to address.").  And, finally, to the extent that the Interpretation reflects the Agency's interpretation of its own regulation, it is entitled to even greater deference than under *Chevron.  Id.* at 333.

Alternatively, even if it cannot claim *Chevron* deference, the agency would still prevail based on the persuasive power of its reasoning.  In *United States v. Mead Corp*., 533 U.S. 218, the Supreme Court made clear that even a ruling made without the "force of law" is entitled to "claim the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight."  *Id*. at 235.  "'The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

---

[17] And, though the FTC acknowledges that Non-Consumer Report Dealers may not have on hand all of the information necessary for the RBPN, it also noted that, given the preexisting channels of communication between financing sources and auto dealers (to convey, for example, credit applications and loan rates), the dealer could get the credit report information from the financing source as well.  (Def.'s Opp'n at 9 & n. 2 (explaining that the actual credit report need not be provided so long as the information is conveyed to the consumer)); 16 C.F.R. § 640.5(e). Therefore, the Interpretation may create an inconvenience for the Non-Consumer Report Dealers, but it does not mandate an impossibility nor does it obligate them to purchase a consumer report.

and all those factors which give it power to persuade, if lacking power to control.'"  *Id*. at 228

(quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)) (alteration in original).

Arguing that the Interpretation does not deserve *Mead* deference, NADA contends that it

is not persuasive because it is not grounded in past precedent (Pl.'s Mot. to Dismiss at 20-21;

Pl.'s Opp'n at 10, 23-24; Pl.'s Reply at 8), and because the practical difficulties it produces prove

that is the product of either faulty reasoning or insufficient expertise.  (Pl.'s Mot. to Dismiss at

20-21; Pl.'s Opp'n at 10-12, 25; Pl.'s Reply at 9.)  This argument necessarily fails.  For the same

reasons that the Interpretation is reasonable, it is persuasive.

As an initial matter, it bears noting that, though the Interpretation was not subject to

notice and comment, its promulgation was relatively formal as it was prompted by NADA's

comment, submitted in a formal rulemaking process, and published in the Federal Register as

part of RBPN rulemaking on a different issue.[18]  In addition, the explanation that accompanied

the Interpretation shows the thoroughness of the FTC's evaluation and the soundness of its logic.

NADA's argument that the Interpretation is unpersuasive because it lacks precedent fails

because, as explained above, the Agency did not depart from the statute or prior agency practice.

Rather, the Interpretation is consistent with the 2010 regulations and with the regulatory scheme

which places the obligation to provide the RBPN on the entity with whom the consumer

interacts.  (*See* 76 Fed. Reg. at 41,606 n.6.)  The FTC's conclusion that auto dealers are able to

get that information and are best suited to convey it to the consumer is eminently reasonable.

(*Id*. at 41,606-07 & nn. 7, 9; *see also* Def.'s Opp'n at 9.)

---

[18] Although *Mead* is said to apply to "less formal" administrative actions, *Barnhart*, 535 U.S. at
221, the degree of formality associated with a decision is nonetheless relevant under *Mead*,
which governs the review of many forms of administrative rulings that are far less formal than
the Interpretation.  *See, e.g*., *Ass'n of Civilian Technicians, Inc. v. United States*, 601 F. Supp. 2d
146, 151 (D.D.C. 2009) (reviewing refusal to reinstate former members of the National Guard).

Furthermore, it is critical to highlight the flip-side of NADA's practicality argument. While it decries the administrative burden the Interpretation imposes, NADA ignores the fact that its proposed interpretation presents its own problems (*i.e.,* it could upset the administration of the broader statutory regime, result in consumers receiving confusing information, or prevent consumers from receiving any information at all). NADA also downplays the fact that the Agency considered the practical difficulties pointed out by NADA and, instead, dismisses the Agency's suggested alternatives (*see supra* note 17) as things that "generally do not" happen. (Pl.'s Reply at 9.) However, the fact that Non-Consumer Report Dealers may have to operate differently does not call into question the FTC's decisionmaking.

While NADA may not like the Agency's conclusions, the persuasiveness of the FTC's reasoning entitles it to deference under *Mead*.

## III.   ARBITRARY AND CAPRICIOUS CHALLENGE

In its second claim for relief, NADA argues that, even if the FTC's interpretation survives *Chevron*, it is nonetheless "arbitrary, capricious, and otherwise not in accordance with law." (Pl.'s Mot. for Summ. J. at 24 (citing 5 U.S.C. § 706(2)(A)); Pl.'s Opp'n at 25.) In response, the FTC argues that it prevails under *Chevron* or *Mead* with respect to Count II for essentially the same the reasons it prevailed on Count I. (Def.'s Mot. to Dismiss at 22-24.)[19]

---

[19] While it recognizes that there is a distinction between statutory interpretation and whether a decision is arbitrary and capricious, the FTC correctly points out that *Chevron*'s Step Two inquiry and the arbitrary and capricious analysis are closely related. (*See* Def.'s Reply at 7); *see also Arent v. Shalala*, 70 F.3d 610, 616 & n.6 (D.C. Cir. 1995). In contrast to *Chevron*'s Step Two, the arbitrary and capricious analysis focuses more on the agency's "decision-making process and rationale behind [its] action." *Individual Reference Servs. Group, Inc. v. FTC*, 145 F. Supp. 2d 6, 25 (D.D.C. 2001). The analyses are aligned in this case because NADA's arbitrary and capricious claim challenges "how faithfully [the agency] follow[ed] the . . . detailed direction" within the statute. *Nat'l Ass'n of Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 726-27 (D.C. Cir. 1994).

Under § 706(2)(A), an administrative action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  While agency actions are presumed valid and granted substantial deference, they are not spared a "thorough, probing, in-depth review."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971).  Courts must assure themselves that the agency has considered the relevant information and explained a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  The scope of review under this standard is narrow; it requires that an agency's decision be upheld "if the agency's path may reasonably be discerned" and reversed only where "there has been a clear error of judgment." *Id*. (citations omitted).

NADA's arguments here echo those in its first claim.  It contends that the FTC failed to consider the practical problems created by the Interpretation, used the "causal, transaction-based" analysis without any legal basis, and predicated its conclusion on an erroneous understanding of three-party transactions.  (Pl.'s Mot. for Summ. J. at 25.)  However, as explained above, the Agency considered the practical implications of the issue and provided a well-reasoned basis for its decision that is consistent with the regulatory and statutory scheme.  Regardless of whether the FTC's "causal, transaction-based" analysis had been previously articulated, the factors guiding this analysis are completely consistent with the Agency's preexisting regulations.  NADA's protestations, including its arguments that the financing

sources are not the auto dealers' agents and that the burden on auto dealers would be "considerable" (Pl.'s Reply at 9), do not establish an error of judgment or undermine the FTC's decision. Thus, there is no basis for invalidating the FTC's interpretation as arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court denies plaintiff's motion and grants summary judgment to defendant. A separate order accompanies this Memorandum Opinion.


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: May 22, 2012